Howard L. HAUPT, Plaintiff,

v.

T.D. DILLARD; Robert Leonard; Las Vegas Metropolitan Police Department; City of Las Vegas, Nevada; Clark County, Nevada, Defendants.

No. CV–S–90–121–PMP (RJJ).

United States District Court, D. Nevada.

May 12, 1992.

William F. Gary, Glenn Klein, J. Pat Horton, Brian R. Barnes, Horton & Koenig, Eugene, Or., Daniel Markoff, Las Vegas, Nev., for plaintiff.

James R. Olson, Walter Cannon, John Gormley, Las Vegas, Nev., for defendants.

## ORDER

PRO, District Judge.

Before the Court is Defendants' Motion for Summary Judgment Re: Plaintiff's § 1983 Claims (# 62) which was filed on August 19, 1991. Plaintiff, Howard Haupt ("Haupt"), submitted an Opposition (# 72) on November 1, 1991 followed by an Erratum (# 74) filed on November 4, 1991. Defendants filed their Reply (# 77) on December 16, 1991. On April 17, 1992, the Court conducted a hearing regarding Defendants' Motion.

## I. FACTS

The underlying facts of this case are based on the disappearance and murder of a seven year old boy, Alexander Harris ("Harris"), the ensuing police investigation, and the subsequent prosecution and acquittal of the plaintiff Haupt. On November 27, 1987, Harris and his family stopped at Whisky Pete's Hotel and Casino in Stateline, Nevada on their way home to California. During the stop, Harris' parents left him in the video game arcade while they went to the casino to gamble. At approximately 11:00 a.m., Harris' mother returned to the arcade to check up on her son only to discover that he was missing. Mrs. Harris immediately contacted hotel security who searched the premises, but were unable to locate the boy. At this point, the Las Vegas Metropolitan Police ("Metro") were called in, and initiated an investigation into the apparent kidnapping.

Approximately one month later, on December 30, 1987, a maintenance worker discovered Harris' body underneath a trailer on the grounds on the casino. An autopsy was done which revealed that Harris had been murdered on or about the day he was reported missing by means of strangulation. Shortly after the discovery of the body, Detectives Tom Dillard ("Dillard") and Robert Leonard ("Leonard") were assigned to investigate the murder. See Defendants' Motion for Summary Judgment (# 62), Exhibit A, p. 4–8.

During the investigation, several leads were developed in trying to locate the boy. Prior to the time when Metro was contacted, a resident of the hotel, Mr. James Austin ("Austin"), reported he saw Harris on the second floor walking with his "father." Defendants' Motion for Summary Judgment (# 62), Exhibit A, p. 2. Several other witnesses were also located who had apparently seen a boy matching the description of Harris walking away with a man. Following is a summary of the eyewitness accounts and the facts which they contributed to the investigation:

(1) *James Austin* ("Austin")—Austin is a California resident who was staying on the second floor of the hotel on date on

Harris' disappearance. On November 27, 1987, Austin stated that as he was leaving his room he saw a man and young boy walk past him in the hallway. Also, on that date, Austin gave a physical description of the man he saw as being white, 35–38 years old, wearing glasses and a brown jacket, and having his hair combed forward. Plaintiff's Opposition (# 72), Exhibit 40, p. 1. Later, on January 22, 1988, Austin gave another description of the man he saw (wearing a tan jacket, having wire-rimmed glasses, brown hair combed forward, 5'8" tall, and between 38 and 40 years old) and indicated that on a scale from one to ten, he was an eight in certainty that Harris was the boy he had seen in the hallway. Plaintiff's Opposition (# 72), Exhibit 41, p. 4–7. On that same day, Austin viewed a videotape taken from a security camera in the arcade which showed a man in a tan jacket. Austin indicated that the man in the video was not the man he had seen later that day, noting particularly that the individual in the picture was balding. Plaintiff's Opposition (# 72), Exhibit 41, p. 10–11. Finally, on January 22, 1988, Austin was taken to Haupt's place of work in San Diego in an attempt to identify him in person. While at Haupt's office, Austin sat near the entryway and watched people as they came into the building. After watching approximately 10 other people enter the office, Austin keyed in on Haupt. Austin then asked to see Haupt again, and was walked by the area in which Haupt works. Later that day, Austin identified Haupt as the man he saw in November with a certainty level of seven and a half to eight, and subsequently picked Haupt in a photographic lineup. Plaintiff's Opposition (# 72), Exhibit 42, p. 2–5.[1]

(2) *Catherine Perry* ("Perry")—Perry is a Twenty–One dealer at the casino who was on a break when she first saw Harris leaving the video arcade with a man. Initially, on December 3, 1987, Perry indicated to Metro that she thought the man with the boy was John Beno, a man she knew who worked at the same casino. Perry also stated that when she said "hi" to the man that he looked startled or surprised, said "hi" in return, and then walked away. *See* Plaintiff's Opposition (# 72), Exhibit 33, p. 1–2. Later, on January 19, 1988, Perry gave a detailed description of the man she saw as being 5'8"–5'9", 33–36 years old, having light brown hair, and wearing a tan jacket and wire-rimmed glasses. Plaintiff's Opposition (# 72), Exhibit 53, p. 2–7. Also on January 19, 1988, Perry was shown a photographic lineup containing six photographs including a picture of Haupt. Although Perry stated that she could not "absolutely identify" the man she saw, she did pick Haupt from the photographs and characterized the certainty of her pick that he was the man she saw as an eight on a scale from one to ten. Plaintiff's Opposition (# 72), Exhibit 53, p. 6. Finally, on February 5, 1988, Perry was flown down to San Diego, and posing as an interior decorator, was given a tour of Haupt's workplace.[2] During that visit, Perry recognized Haupt as the man she had seen earlier in November. In a interview later that day, Perry indicated that her identification of Haupt was based on both her memory of the incident as well as the photo lineup she was

---

1. Prior to sending any of the witnesses to San Diego on a walk through tour of Haupt's workplace, attorneys from the Clark County District Attorney's Office were made privy to the identification procedure. These attorneys did not raise any concerns regarding the constitutionality or suggestiveness of such a procedure. Defendants' Motion for Summary Judgment (# 62), Exhibit H, p. 68–69. In addition, FBI Special Agent Michael Potkonjak ("Potkonjak") accompanied Austin during his identification of Haupt. Potkonjak later testified that he did not believe such an identification process was un-

duly suggestive given the number of employees at the facility and the fact that he was told that the District Attorney's Office had approved the identification procedure. Defendants' Motion for Summary Judgment (# 62), p. 53.

2. Accompanying Perry on this tour was FBI Special Agent Stephanie Hahn ("Hahn"). It should be noted prior to the tour, Agent Hahn had never seen a picture of Haupt, and did not know what he looked like. *See* Defendants' Motion for Summary Judgment (# 62), p. 52.

later shown. Perry also indicated that after seeing Haupt in person, her level of certainty that he was the man she had seen with Harris could be characterized as a nine on a scale from one to ten. *See* Plaintiff's Opposition (# 72), Exhibit 54, p. 1–2.

(3) *Keri & Steve Allen* ("K. or S. Allen")—On November 27, 1988, K. Allen, a housekeeper at the hotel, met her husband S. Allen, a maintenance man at the hotel, for lunch. While they were walking to the casino, both saw a man who was holding the hand of a young boy walking down the hallway. Plaintiff's Opposition (# 72), Exhibit 34, p. 1–2. On November 27, 1987, K. Allen described the man she saw as being at least 6'0" tall, thinning light brown hair with a wisp of hair on his forehead, and wearing wire-rimmed glasses. Defendants' Motion for Summary Judgment (# 62), Exhibit E, p. 1. S. Allen described the man as being 6'0"–6'3", having sandy blond or light brown hair, and wearing glasses. On November 29, 1987, both S. Allen and K. Allen were shown a photographic lineup which did not include Haupt. In this lineup, both identified Steve Paajanen as "a possible suspect." Plaintiff's Opposition (# 72), Exhibit 20, p. 1. Later, on December 4, 1987, both S. Allen and K. Allen were shown a book of photographs, and both picked the photograph of John Beno indicating that this was the man that they had seen. K. Allen characterized her identification of Beno as "pretty sure," while S. Allen stated that he was ninety percent certain that Beno was the man he had seen. Plaintiff's Opposition (# 72), Exhibit 27, p. 1–2. Next, on January 15, 1988, both K. Allen and S. Allen were shown a photographic lineup which contained a picture of Haupt. Neither witness identified Haupt as the individual

they saw in November. When asked to remark on each photograph individually, K. Allen commented that Haupt's picture was "definitely not" the man she saw, and that he was "too old." S. Allen commented that the picture of Haupt had some resemblance to the man he had seen, however, he thought the individual in the picture was "too old," that his sideburns were too long, and that his memory was "foggy" from seeing so many people. *See* Plaintiff's Opposition (# 72), Exhibit 34, p. 14–19. Finally, on February 11, 1988, K. Allen and S. Allen were flown down to San Diego and taken to the office in which Haupt works.[3] Posing as an interior decorator, K. Allen stated that she saw about 70 people and identified Haupt with a certainty level of between nine and ten as the man she had seen in November. When asked why she didn't pick out Haupt in the earlier photographic lineup, K. Allen commented that the photograph did not accurately portray Haupt in that his hair was different and that it made him look too old. Plaintiff's Opposition (# 72), Exhibit 55, p. 1–5. S. Allen also indicated that upon seeing Haupt in San Diego that he had a certainty level of nine that Haupt was the man he had seen in November. S. Allen also commented that Haupt's picture differed from his personal presence. Plaintiff's Opposition (# 72), Exhibit 56, p. 1–3.[4]

As shown above, during the initial stages of the investigation, the suspect was described as a white male, approximately 35–38 years old, wearing wire-rimmed glasses, having brown or light-brown hair with an inconclusive thickness, and being anywhere between 5'8" and 6'3" tall. *See supra*, p. 1482–1483. On December 31, 1987, a surveillance tape which monitored a portion of

---

**3.** On this tour, the Allens were accompanied by FBI Special Agent Edward Jantzen ("Jantzen") who is an attorney and legal advisor for the FBI. In a later deposition, Jantzen indicated that he believed that such a tour was not unduly suggestive and constitutionally appropriate. *See* Defendants' Motion for Summary Judgment (# 62), p. 54.

**4.** In addition to the facts cited above, there is also some evidence which would cast doubt on the reliability of the Allens' identification. During the time the investigation was taking place, some suspicion existed that the Allens' testimony may have been influenced by a desire to collect reward money being offered at the time. *See* Plaintiff's Opposition (# 72), Exhibit 19, p. 28–29.

the arcade was obtained from the security office of the hotel. Although the quality of the tape was poor, it did show that at the time of Harris' disappearance a man with a tan jacket was present in the arcade. Defendants' Motion for Summary Judgment (# 62), Exhibit A, p. 6–7. Based on the information cited above, Metro began to investigate several individuals who fit the general description listed above including Steve Paajanen, John Beno, and Gunner Iverson. The results of such investigations, however, proved to be inconclusive.[5]

As the investigation progressed, Metro detectives began to theorize that the suspect might have been a guest staying in the hotel, especially since Austin had seen the suspect walking on the second floor. Defendants' Motion for Summary Judgment (# 62), Exhibit A, p. 10–11. Accordingly, Metro detectives obtained names and addresses of all individuals who stayed at the hotel on November 27, 1987. Noting that approximately 90% of the guests registered were California residents, Detective Dillard contacted the California Department of Motor Vehicles and obtained photographs and information on all California residents who had been staying on the first two floors. Upon review of the information supplied by the California authorities, Dillard keyed in on Haupt as a possible suspect. On the day of the disappearance, Haupt had been staying at the hotel in room 229 which is located near the area where Austin had seen the suspect. Moreover, the physical description derived from Haupt's California driver's license indicated that he was 37 years old, 6'0" tall, 145 pounds, brown hair, and required corrective lenses (the license photograph also depicted wire-frame glasses). Defendants' Motion for Summary Judgment (# 62), Exhibit A, p. 11–12. Based on this information, on January 13, 1988, Dillard and Leonard sent a letter to Haupt advising him of the investigation and asking if he would voluntarily submit to being fingerprinted and photographed. Haupt took no action to respond to this letter.[6]

At this point of the investigation, Detectives Dillard and Leonard attempted to determine if any of the eyewitnesses could identify Haupt as the man that they had seen. As summarized above, by February 11, 1988, all of the witnesses had seen Haupt in either a photographic line-up, in person at his place at work, or both, and had identified him as the man that they had seen with various degrees of certainty. See, supra, p. 1482–1483. Based upon the identifications of Haupt and the other circumstantial evidence in the case, Detectives Dillard and Leonard formed the opinion that Haupt was the individual who had kidnapped and murdered Harris. The detectives contacted Clark County Chief Deputy District Attorney Mel Harmon ("Harmon") and asked him to review the file and give his opinion on whether probable cause existed. Harmon agreed with the detectives, and indicated that he believed that there was probable cause to believe that Haupt was responsible for the disappearance and death of Harris. See Defendants'

---

5. Ultimately, Metro shifted their focus away from the aforementioned individuals due to existence of corroborated alibis. Steve Paajanen, who is a convicted child molester matching the general physical description of the suspect, was apparently home that day changing the oil in his car at the time of the incident. This alibi was corroborated by a neighbor, his father, and a polygraph examination. Plaintiff's Opposition (# 72), Exhibit 19, p. 15–18. John Beno, who was a busboy at a restaurant in the hotel, was working in the restaurant at the time. This alibi was corroborated by the testimony of the cashier and hostess as well as by the fact that John Beno has a severely deformed arm which would have been noticed by the witnesses. Plaintiff's Opposition (# 72), Exhibit 19, p. 43–46; Defendants' Motion for Summary Judgment (# 62), Exhibit A, p. 10. Finally, as to Gunner Iverson, although the precise reasoning upon which Metro rejected him as a suspect is unclear, such a conclusion was supposedly based on the results of an inconclusive polygraph and the exculpatory testimony of Iverson's friends. See Plaintiff's Opposition (# 72), Exhibit 19, p. 31, Exhibit 31, p. 16–20, Exhibit 35.

6. A second letter was also sent to Haupt requesting his aid in the investigation. To this second letter, Haupt did respond by contacting local authorities. In doing so, Haupt explained that he did not respond to the first letter because he thought he was not really needed or that the letter "wasn't really for me." Defendants' Motion for Summary Judgment (# 62), p. 16; Exhibit A, p. 11–12, 20.

Motion for Summary Judgment (# 62), p. 28–31. Thereafter, Dillard submitted an affidavit in support of a request for an arrest warrant.[7] On February 16, 1988, based on Dillard's affidavit, Judge James Bixler, Justice of the Peace for Clark County, issued a warrant for the arrest of Haupt. Defendants' Motion for Summary Judgment (# 62), p. 25.[8]

On February 19, 1988, Haupt was taken into custody in San Diego by the Federal Bureau of Investigation ("FBI") for interrogation. After being read his Miranda rights, Detective Dillard, Detective Leonard, and FBI Special Agent Potkonjak questioned Haupt for approximately four and a half hours about the kidnapping and murder of Harris. During the questioning, Haupt indicated to the officers that he might want a lawyer.[9] The questioning then proceeded with Haupt being without the benefit of counsel. Once the interrogation was over, Haupt was formally arrested and incarcerated. See Defendants' Motion for Summary Judgment (# 62), p. 17–21; Plaintiff's Opposition (# 72), p. 9; Exhibit 6, p. 209–212.

On May 25, 1988, a preliminary hearing was held before Clark County Justice of the Peace Dan Ahlstrom to determine whether there was probable cause to bind Haupt over for trial. At that hearing, the eyewitnesses K. Allen, Austin, and Perry all testified and were subjected to cross-examination by Haupt's defense attorney, Steven Stein. Also at the preliminary hearing, Haupt called Stephen Scarborough ("Scarborough"), a fingerprint analyst at

Metro, as a witness for the defense. During his testimony, Scarborough indicated that a partial fingerprint lifted from the eyeglasses of Harris was compared with the fingerprint of Haupt and that the result was "negative." On cross-examination, however, Scarborough also indicated that the latent print found on the glasses was such a poor sample that he believed it was not of sufficient quality to be identifiable. Defendants' Motion for Summary Judgment (# 62), Exhibit A, p. 149, 151. At the end of the hearing, Judge Ahlstrom found that probable cause existed to believe that Haupt had committed the crimes with which he had been charged. Defendants' Motion For Summary Judgment (# 62), Exhibit O.[10]

On January 9, 1989, Haupt was tried in the Eighth Judicial District Court for the County of Clark, State of Nevada, for the kidnapping and murder of Alexander Harris. On February 8, 1989, while reviewing jury instructions, presiding Judge Stephen Huffaker indicated to counsel that he was considering giving the jury an advisory opinion instruction pursuant to Nevada Revised Statute 175.381 recommending that they acquit Haupt. At that time, Deputy District Attorney Harmon became agitated and stated, among other things, that if the Court gave such an instruction, the "blood of Alexander Harris" would be on its hands. Plaintiff's Opposition (# 72), Exhibit 2, p. 3–7. The next day, Detective Dillard called Judge Huffaker and indicated a desire to talk to him. After some hesitation, Huffaker decided to take Detective

---

7. In the affidavit, Dillard basically outlined the facts of the disappearance, described the identification evidence, and proposed various theories which supported the suspicion that Haupt was responsible for the disappearance and murder of Harris. See Defendants' Motion for Summary Judgment (# 62), Exhibit A.

8. An additional arrest warrant for Haupt was issued by United States Magistrate Judge Lawrence Leavitt based on the affidavit submitted by Dillard. The criminal charge complained of in the federal warrant was unlawful flight to avoid prosecution. See Plaintiff's Opposition (# 72), p. 9; Exhibit 8.

9. More specifically, during the questioning, Detective Dillard stated that "Okay, Howard, you're in a lot of trouble." In response, Haupt

replied "I guess I need a lawyer or something." Dillard then responded "Well, that's your right." See Plaintiff's Opposition (# 72), Exhibit 6, p. 212.

10. In addition to the preliminary hearing, prior to trial, Stein filed a writ for habeas corpus with the trial court asserting lack of probable cause. Clark County District Judge Stephen Huffaker dismissed the writ finding that there was probable cause to believe that Haupt had committed the crimes charged. See Defendants' Motion for Summary Judgment (# 62), p. 31–32. In a later deposition, Stein agreed that probable cause did exist against his client. See Defendants' Motion for Summary Judgment (# 62), p. 32–33.

Dillard's call. In their conversation, Dillard stated that he understood that the Court was intending to give an advisory jury instruction. At that point, Judge Huffaker indicated that he thought it would be inappropriate for them to discuss the matter. To this Dillard responded, "I don't know. I just think it's ridiculous, just ridiculous." Plaintiff's Opposition (# 72), Exhibit 2, p. 7–8. Ultimately, Judge Huffaker decided not to give the advisory jury instruction. In doing so, Judge Huffaker mentioned that he felt "intimidated" by the conduct of both Harmon and Dillard. Plaintiff's Opposition (# 72), Exhibit 2, p. 10–14.[11]

Notwithstanding the absence of the advisory jury instruction, on February 16, 1989, Haupt was acquitted on all criminal charges against him.

On February 15, 1990, Haupt filed the instant lawsuit seeking damages based on the preceding events. Claims asserted by Haupt include: 1) an action pursuant to 42 U.S.C. § 1983 for damages based on the deprivation of the following constitutional rights; a) freedom from malicious prosecution, b) freedom from unduly suggestive photographic identifications, c) freedom from unreasonable searches and seizures, d) the right to have an attorney present during interrogation, and e) the right to a fair and impartial trial; 2) an action pursuant to 42 U.S.C. § 1983 for conspiracy to violate his constitutional rights; and 3) the pendent state claims of false imprisonment, intentional infliction of emotional distress, and defamation. Complaint (# 1), p. 8–11. Defendants have moved for summary judgment on the civil rights claims asserting that 1) there was probable cause for the arrest and prosecution of Haupt, 2) it was the independent decision of the District Attorney's Office to arrest and prosecute Haupt, 3) Haupt has no actionable claim for Miranda violations, 4) Haupt has no actionable claim for an unduly suggestive identification, 5) Haupt was not denied a fair trial, 6) Detectives Leonard and Dillard are entitled to qualified immunity, 7) the doctrine of collateral estoppel bars Haupt's claims of malicious prosecution and unduly suggestive identification, and 8) Haupt has failed to demonstrate a policy, custom, or statute by Metro which has resulted in the violation of his constitutional rights.

## II. STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

The party moving for summary judgment has the initial burden of showing the absence of a genuine issue of material fact. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir.1982). Once the movant's burden is met by presenting evidence which, if uncontroverted, would entitle the movant to a directed verdict at trial, the burden then shifts to the respondent to set forth specific facts demonstrating that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). If the factual context makes the respondent's claim implausible, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *California Arch. Bldg. Prod. v. Franciscan Ceramics*, 818 F.2d 1466, 1468 (9th Cir.1987), *cert. denied*, 484 U.S. 1006, 108 S.Ct. 698, 699, 98 L.Ed.2d 650 (1988).

---

11. At a subsequent deposition, however, Judge Huffaker indicated that the decision not to give the advisory instruction was based on his desire to "save the trial," and that in his opinion, such a decision adequately protected the rights of Haupt. *See* Defendants' Motion for Summary Judgment (# 62), Exhibit S, p. 51.

If the party seeking summary judgment meets this burden, then summary judgment will be granted unless there is significant probative evidence tending to support the opponent's legal theory. *Long v. Bureau of Economic Analysis*, 646 F.2d 1310, 1321 (9th Cir.1981); *Commodity Futures Trading Commission v. Savage*, 611 F.2d 270 (9th Cir.1979). Parties seeking to defeat summary judgment cannot stand on their pleadings once the movant has submitted affidavits or other similar materials. Affidavits that do not affirmatively demonstrate personal knowledge are insufficient. *Long*, 646 F.2d at 1321. Likewise, "legal memoranda and oral argument are not evidence and do not create issues of fact capable of defeating an otherwise valid motion for summary judgment." *Id., citing British Airways Bd. v. Boeing Co.*, 585 F.2d 946 (9th Cir.1978), *cert. denied*, 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241 (1979).

A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the differing versions of the truth. *See Admiralty Fund v. Hugh Johnson & Co.*, 677 F.2d 1301, 1305–06 (9th Cir.1982); *Admiralty Fund v. Jones*, 677 F.2d 1289, 1293 (9th Cir.1982).

All facts and inferences drawn must be viewed in the light most favorable to the responding party when determining whether a genuine issue of material fact exists for summary judgment purposes. *Poller v. CBS, Inc.*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). After drawing inferences favorable to the respondent, summary judgment will be granted only if all reasonable inferences defeat the respondent's claims. *Admiralty Fund v. Tabor*, 677 F.2d 1297, 1298 (9th Cir.1982).

The trilogy of Supreme Court cases cited above establishes that "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp.*, 477 U.S. at 327, 106 S.Ct. at 2555, *quoting* Fed.R.Civ.P. 1). *See also Avia Group Int'l, Inc. v. L.A. Gear Cal.*, 853 F.2d 1557, 1560 (Fed.Cir.1988).

### III. SECTION 1983 CLAIM FOR MALICIOUS PROSECUTION

In order to maintain a § 1983 claim for malicious prosecution, a plaintiff must demonstrate the elements of the tort under state law, as well as a resulting deprivation of constitutionally protected rights. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561–562 (9th Cir.1987); *Torres v. Superintendent of Police of Puerto Rico*, 893 F.2d 404, 409 (1st Cir.1990). *See also Gowin v. Altmiller*, 663 F.2d 820, 823 (9th Cir.1981). In Nevada, the prima facie elements of the tort of malicious prosecution are (1) want of probable cause, (2) malice, (3) termination of litigation, and (4) resulting damages. *Chapman v. City of Reno*, 85 Nev. 365, 369, 455 P.2d 618 (Nev.1969).

Among the arguments presented by the Defendants in support of their motion for summary judgment is the contention that Haupt has not demonstrated a lack of probable cause. Defendants' Motion for Summary Judgment (# 62), p. 22–38, 75–78. Defendants point to the fact that prior to the trial, Judge Ahlstrom held a preliminary hearing and found that probable cause existed to try Haupt for the disappearance and murder of Harris. Given this, Defendants argue that collateral estoppel prevents Haupt from demonstrating a lack of probable cause in the present case, which in turn, requires summary judgment on Plaintiff's claim of malicious prosecution. Defendants' Motion for Summary Judgment (# 62), p. 75–78. In response, Haupt states that collateral estoppel is inappropriate based on the fact that (1) the probable cause standard in Nevada is different than that employed in the federal system, and (2) Haupt was unable to appeal the ruling of Judge Ahlstrom, and thus did not have a full and fair opportunity to litigate the issue of probable cause.

As an initial matter, it is clear that the doctrine of collateral estoppel applies to actions brought under § 1983, and may prevent parties from relitigating issues decided in earlier state criminal proceedings.

*Allen v. McCurry,* 449 U.S. 90, 101 S.Ct. 411, 420, 66 L.Ed.2d 308 (1980); *Takahashi v. Board of Trustees of Livingston,* 783 F.2d 848, 850 (9th Cir.1986), *cert. denied,* 476 U.S. 1182, 106 S.Ct. 2916, 91 L.Ed.2d 545 (1986). To determine whether the principle of collateral estoppel bars a claim, federal courts must look to the law of the state in which the final judgment was entered. *Ayers v. City of Richmond,* 895 F.2d 1267, 1270 (9th Cir.1990). In Nevada, in order for collateral estoppel to apply, the moving party must demonstrate that the issue was actually litigated in the first proceeding and necessarily determined, and that the parties in the second proceeding are the same or in privity with those in the first proceeding. *See Marine Midland Bank v. Monroe,* 104 Nev. 307, 756 P.2d 1193 (Nev.1988); *Paradise Palms Community Association v. Paradise Homes,* 89 Nev. 27, 505 P.2d 596, 599 (Nev.1973).

Based on the above requirements, this Court finds that the issue of whether probable cause existed to prosecute Haupt is precluded by Judge Ahlstrom's earlier decision at the preliminary hearing. It is undisputed that the parties in this proceeding are the same or in privity with those in the original state prosecution. *See* Plaintiff's Opposition (# 72), p. 28. It is also clear that upon reviewing all the evidence presented, Judge Ahlstrom concluded that there was probable cause to bind Haupt over for trial. *See* Defendants' Motion for Summary Judgment (# 62), Exhibit O, p. 265. At the preliminary hearing, Judge Ahlstrom saw numerous exhibits and heard testimony from eight different witnesses, including Austin, Perry, and K. Allen. Haupt was able to call witnesses in his own defense, and each of the prosecution's witnesses, including the identifying witnesses, were vigorously cross-examined by Haupt's defense attorney. *See* Defendants' Motion for Summary Judgment (# 62), Exhibit O. It is equally evident from the transcript of the preliminary hearing that Judge Ahlstrom was made aware of the various inconsistencies surrounding Austin, Perry, and K. Allen's identification of Haupt. *See* Defendants' Motion for Summary Judgment (# 62), Exhibit O, p. 100–142, 166–197,

218–250. In essence, Haupt was given a preliminary hearing which included all the adversarial type safeguards of a trial proceeding. Therefore, this Court concludes that Judge Ahlstrom's finding that probable cause existed to prosecute Haupt precludes that issue from being raised in this proceeding under the doctrine of collateral estoppel. *See Coogen v. City of Wixom,* 820 F.2d 170, 175 (6th Cir.1987); *Guenther v. Holmgreen,* 738 F.2d 879, 884–889 (7th Cir.1984), *cert. denied* 469 U.S. 1212, 105 S.Ct. 1182, 84 L.Ed.2d 329 (1985); *Hubbert v. City of Moore, Oklahoma,* 923 F.2d 769, 773 (10th Cir.1991).

This Court also rejects Haupt's arguments that the standard of probable cause in Nevada is different than the federal standard and the argument that since a preliminary hearing in Nevada is interlocutory, there can be no final determination of probable cause. As to Haupt's first argument, it is clear that the standard for probable cause in Nevada is the same as that required by the United States Constitution. *See Washington v. State,* 94 Nev. 181, 576 P.2d 1126 (Nev.1978); *Wyatt v. State,* 86 Nev. 294, 468 P.2d 338, 341 (Nev.1970); *Lamb v. Holsten,* 85 Nev. 566, 459 P.2d 771, 772 (Nev.1969); *see also* the discussion in *Guenther,* 738 F.2d at 887–888. As to Haupt's second argument, the determination of probable cause made in a preliminary hearing may be challenged prior to trial by a writ of habeas corpus in the State District Court with an appeal available to the Nevada Supreme Court. *See Lamb,* 459 P.2d at 772. In fact, in this case, Haupt filed such a writ which was denied by Judge Huffaker. *See* footnote 10, *supra.* This Court also rejects Haupt's conclusory statement that "tactics" prevented him from fully challenging probable cause at the preliminary hearing. *See Guenther,* 738 F.2d at 886–887.

This Court also rejects Haupt's interpretation of *Bretz v. Kelman,* 773 F.2d 1026, 1031 (9th Cir.1985), *Cline v. Brusett,* 661 F.2d 108, 112 (9th Cir.1981), and *Johnson v. Barker,* 799 F.2d 1396, 1400 (9th Cir.1986) as they apply to the present case. *See* Plaintiff's Opposition (# 72), p. 17–20.

These cases merely hold that where there has been a conspiracy to both convict a person on groundless charges and deny that person a fair trial, an action for malicious prosecution under § 1983 may properly be maintained. *Johnson,* 799 F.2d, at 1400. In the present case, it has already been established that there was probable cause to try Haupt thus precluding any argument that the Defendants conspired to convict him on groundless charges.

Accordingly, Defendants are entitled to summary judgment of Haupt's § 1983 claim for malicious prosecution.

### IV. SECTION 1983 CLAIM FOR VIOLATION OF MIRANDA RIGHTS

■ In its recent decision, *Cooper v. Dupnik,* 963 F.2d 1220 (9th Cir.1992), the Ninth Circuit addressed the issue of whether the violation of an individual's Miranda rights can serve as a basis for damages under § 1983. The Ninth Circuit concluded that in order to maintain such an action, a plaintiff must demonstrate that the police conduct surrounding the asserted Miranda violation also violates the Fifth Amendment's privilege against self-incrimination. *Id.,* at 1235–1244. In explaining its holding the Court also stated that:

> (C)onduct that merely violates Miranda safeguards without also trespassing on the actual Constitutional right against self-incrimination that those safeguards are designed to protect (does not create a Fifth Amendment cause of action under § 1983). This case does not establish a cause of action where police officers continue to talk to a suspect after he asserts his rights and where they do so in a benign way, without coercion or tactics that compel him to speak.

*Id.,* at 1243–1244.

In the present case, Haupt was detained, read his Miranda rights, indicated that he probably needed a lawyer, and despite this, continued to be questioned by Metro detectives. Nothing in the record suggests in any way that Haupt was subjected to coercive interrogational tactics or improperly treated in any other way.[12] In light of the holding in *Cooper,* such actions do not amount to a constitutional deprivation under § 1983. Therefore, Defendants are entitled to summary judgment on Haupt's Section 1983 claim based on a right to have counsel present at interrogation.

### V. SECTION 1983 CLAIM FOR SUGGESTIVE PHOTOGRAPHIC IDENTIFICATION

■ As both Haupt and the Defendants recognize in their briefs, a seventh circuit decision, *Hensley v. Carey,* 818 F.2d 646 (7th Cir.1987) *cert. denied,* 484 U.S. 965, 108 S.Ct. 456, 98 L.Ed.2d 395 has held that use of an unduly suggestive identification procedure does not amount to a constitutional infringement sufficient to support a claim under § 1983. The Court in that case held that similar to the cases which state that a *Miranda* violation by itself does not amount to a constitutional violation, there is no constitutional provision which guarantees nonsuggestive identifications. Just as *Miranda* concerned only the exclusion of confessions made without the appropriate warning, the Supreme Court holdings of *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977) and *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), which establish the standard whereby suggestive identifications should be suppressed, establish only the fact that unreliable identifications should not be used at trial. Such cases do not stand for the proposition that an accused has a constitutional right to an impartial lineup, and if such occurs, that the result is a cause of action under § 1983. *See Hensley,* 818 F.2d at 649–650. In light of the soundness of this reasoning, as well as the holding in *Cooper,* this Court concludes that absent extraordinary circumstances[13] even if this Court were to find that the identifications of Haupt were

---

**12.** There is also no evidence in the record to suggest that a confession or any incriminating statements were elicited by Haupt, or were in any way used against him at trial.

**13.** *See Hensley,* 818 F.2d at 650, footnote 4.

unduly suggestive, Haupt could not maintain a claim under § 1983.

■ Furthermore, the Court finds that the identifications in this case were not unduly suggestive. The standard by which to judge an identification is to analyze the "totality of the circumstances," and evaluate whether the identification procedure was so "unnecessarily suggestive as to give rise to substantial likelihood of irreparable misidentification." *See Featherstone v. Estelle*, 948 F.2d 1497, 1504 (9th Cir. 1991); *United States v. Kessler*, 692 F.2d 584, 585–586 (9th Cir.1982); *United States v. Sambrano*, 505 F.2d 284, 286 (9th Cir. 1974); *Wilson v. Ajello*, 496 F.Supp. 804, 807 (D.Conn.1980), *aff'd*, 652 F.2d 55 (1981).

In the present case, Haupt argues that the photographic lineup was unduly suggestive due to the fact that his photograph was tinted differently than the others, and that the officers used suggestive questions during the lineup. Plaintiff's Opposition (# 72), p. 5.[14] Upon review of the photographic lineup, this Court concludes that as a matter of law, it was not unduly suggestive. In the lineup, all six men are wearing glasses, have brown hair, and have similar facial characteristics. In fact, even to say that the tint of the photograph is suggestive could be characterized as an exaggeration since the tints are essentially the same. *See* Defendants' Motion for Summary Judgment (# 62), Exhibit J. *Compare United States v. Lincoln*, 494 F.2d 833, 839 (9th Cir.1974) (color photo of suspect in lineup with eight other black and white photos not unduly suggestive). Moreover, nothing in the transcripts suggest that the officers were unduly suggestive in their questioning. In fact, during the photo lineup presented to the Allens, both were warned not to consider "the background or their coloration" in trying to identify the man they saw, and ultimately, neither of the two was able to pick Haupt out of the lineup. *See* Plaintiff's Opposition (# 72), Exhibit 34, p. 14–18, 53. Accordingly, Haupt's § 1983 claim based on a suggestive photographic lineup should be dismissed.

## VI. SECTION 1983 CLAIM FOR UNREASONABLE SEARCH AND SEIZURE

■ An arrest made without probable cause does give rise to a cause of action for damages under § 1983. *McKenzie v. Lamb*, 738 F.2d 1005, 1007 (9th Cir.1984). In evaluating such cases, judgments of reasonableness are usually questions of fact reserved for the jury, and summary judgment is appropriate only where no reasonable jury could find that the officers did or did not have probable cause to arrest. *McKenzie*, 738 F.2d at 1008; *Wolf v. Napier*, 742 F.Supp. 1014, 1022 (D.Ind.1990). In cases where an arrest is made pursuant to a valid warrant, an officer cannot be held liable for civil damages. *Forster v. County of Santa Barbara*, 896 F.2d 1146, 1147–1148 (9th Cir.1990); *Turner v. County of Washoe*, 759 F.Supp. 630, 633–634 (D.Nev. 1991). In evaluating the validity of an arrest warrant, the Court in *Forster* set forth the following standard:

A warrant is valid only if supported by an affidavit establishing probable cause. There is "a presumption of validity" with respect to the affidavit supporting a warrant. This presumption can be overcome if the party challenging the affidavit makes allegations of deliberate falsehood or reckless disregard for the truth, and those allegations are accompanied by an offer of proof. If these requirements are met, the allegedly false or reckless

---

14. The Complaint in this case alleges only that the photographic lineup was unduly suggestive, and does not refer to the showup in San Diego. Complaint (# 1), p. 8–9. Although Haupt suggests that the photographic lineup may have caused the various witnesses to identify Haupt at work, not a single piece of evidence in the record demonstrates the San Diego showup was unduly suggestive. *See* Plaintiff's Opposition (# 72), p. 5–7. In fact, at the showup, it is uncontested that such occurred in a large area containing approximately 70 people, and that none of the accompanying agents suggested that Haupt was the individual they wanted to identify. *See* summary of identifications and exhibits cited therein, *supra*, p. 1482–1483. Accordingly, there is also no basis to conclude that the San Diego showup could support a claim under § 1983. *Compare Kessler*, 692 F.2d at 586; *Wilson*, 496 F.Supp. at 807–810.

material must be set aside. If there remains sufficient content in the affidavit to support probable cause, the officer is qualifiedly immune. (citations omitted).

*Forster*, 896 F.2d at 1148.

If the warrant is not valid, a Court must then determine whether the police officer's reliance on the warrant was nonetheless objectively reasonable. *Id.*

In the present case, two arrest warrants were issued; one by Nevada Justice of the Peace James Bixler, and another by United States Magistrate Judge Lawrence R. Leavitt. Haupt argues that the affidavits of Detective Dillard, which served as the basis for the warrants, contained false statements and excluded pertinent exculpatory information. More specifically, Haupt states that the affidavit failed to list the physical discrepancies in the eyewitnesses initial descriptions, did not mention that other individuals had been suspected, failed to describe the uncertainty attendant to the various identifications, and intentionally omitted the fact that the fingerprint found on Harris' eyeglasses was evaluated and did not have any points of comparison with Haupt's fingerprint. Plaintiff's Opposition (# 72), p. 8–9. As a result, Haupt argues that the arrest warrants were invalid and that he was illegally arrested and incarcerated.

Notwithstanding the allegations made by Haupt, this Court concludes that the arrest warrants in this case were valid. Haupt's assertions that Detective Dillard intentionally interjected false statements and withheld critical exculpatory statements from the affidavit is simply not supported by the record in the case. For example, Haupt claims that the physical descriptions given by the witnesses were misleading. The affidavits stated that the suspect was described as being "in his late 30's, approximately 6' tall, light brown hair thinning to the left side, wearing round shaped thick,

wire frame glasses, looking very much like the boy and possibly wearing a tan waist length jacket." Defendants' Motion for Summary Judgment (# 62), Exhibit A, p. 4. A review of the descriptions given by the various eyewitnesses reveals that such a statement is a relatively accurate summary of the descriptions given by the eyewitnesses. *See* summary of identifications, *supra*, p. 1482–1483. Furthermore, it is also clear from the affidavit that the circumstances surrounding the identification, although not exhaustive in detail, do present a fair portrayal of the events as they occurred. *See* Defendants' Motion for Summary Judgment (# 62), Exhibit A, p. 14–23. Finally, the fact that the affidavits did not state that there was inconclusive evidence involving the fingerprint and that others had been initially suspected does not impact their overall validity. Although some nominal discrepancies do exist in the arrest warrant affidavits, such anomalies do not detract from the overall truthfulness of the affidavits, and certainly do not amount to the affidavits being tainted by "deliberate falsehood or reckless disregard for the truth." *See also Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 2331, 76 L.Ed.2d 527 (1983) (courts should evaluate affidavits in a common sense, rather than hypertechnical manner).[15]

Additionally, as established before, probable cause to bind Haupt over for trial was found at the preliminary hearing. At that hearing, all of the material facts supporting the arrest, including the identification of Haupt and other mitigating evidence, was raised and evaluated. Based on this, it is clear that probable cause to arrest would have been "necessarily determined" at this hearing, and collateral estoppel should apply to the present claim of false arrest as well. *See Marine Midland Bank*, 104 Nev. at 308, 756 P.2d 1193; *Paradise Palms Community Association*, 505 P.2d, at 599.

---

**15.** This conclusion is further bolstered by the testimony of one of the issuing magistrates who stated that notwithstanding the apparent conflict of some of the earlier information, the affidavit ultimately demonstrated four witnesses had identified Haupt and that he was present at the hotel at the time of the incident. In Judge Bixler's words, "I can say I would have reached the same conclusion (as to probable cause) every time." Defendants' Motion for Summary Judgment (# 62), p. 20–21.

Therefore, Defendants are entitled to summary judgment on Haupt's claim of false arrest under § 1983.

## VII. SECTION 1983 CLAIM FOR DENIAL OF A FAIR TRIAL

■ Haupt's final assertion of a constitutional violation is that he was denied a fair trial by Defendants' alleged intimidation of Judge Huffaker. Plaintiff's Opposition (# 72), p. 13. The record is clear that at the time of the trial, Judge Huffaker indicated that he felt intimidated by the actions of Harmon and Dillard, and that such behavior was at least in part, a reason why he did not give the jury an advisory instruction suggesting acquittal. Plaintiff's Opposition (# 72), p. 10–11. Even without the advisory instruction, however, the jury subsequently acquitted Haupt on all charges.

Naturally this Court is disturbed by the inappropriate behavior of Dillard and Harmon which occurred before Judge Huffaker. Nonetheless, it cannot be said that Haupt was denied a fair trial. First of all, under Nevada Revised Statute 175.381, an advisory instruction suggesting acquittal is not binding on a jury. Therefore Haupt had no substantive right to the giving of such an instruction to the trial jury. More importantly, Haupt was ultimately acquitted of all charges. Even if Haupt did have a right to the advisory instruction, the fact that he was ultimately acquitted conclusively shows that he received a fair trial and that Dillard's actions did not injure him. *See Venegas v. Wagner*, 704 F.2d 1144, 1146 (9th Cir.1983); *United States v. Ferguson*, 758 F.2d 843, 853 (2nd Cir.1985), *cert. denied*, 474 U.S. 1032, 106 S.Ct. 592, 88 L.Ed.2d 572 (1985); *Schiavone Construction Co. v. Merola*, 678 F.Supp. 64, 66 (S.D.N.Y.1988), *affd.*, 848 F.2d 43 (2nd Cir. 1988), *cert. denied*, 488 U.S. 855, 109 S.Ct. 144, 102 L.Ed.2d 116 (1988). Accordingly, the Court finds that Haupt's § 1983 claim for denial of a fair trial is meritless and should be dismissed.

## VIII. SECTION 1983 CLAIM FOR CONSPIRACY

■ In order to maintain a conspiracy claim under § 1983, the Plaintiff must demonstrate some deprivation of a constitutional right which resulted from the alleged conspiracy. *Woodrum v. Woodward County, Okl.*, 866 F.2d 1121, 1126 (9th Cir.1989); *Brennen v. Hendrigan*, 888 F.2d 189, 195 (1st Cir.1989). In addition, to establish a conspiracy, Haupt must show an agreement or a meeting of the minds to violate his Constitutional rights. *Woodrum*, 866 F.2d at 1126; *Fonda v. Gray*, 707 F.2d 435, 438 (9th Cir.1983). While it is not necessary to prove that each participant in a conspiracy know the exact parameters of the plan, they must at least share the general conspiratorial objective. *Fonda, Id.* Finally, vague and conclusory allegations with no supporting factual averments are insufficient to withstand an adequately supported motion for summary judgment. *Woodrum*, 866 F.2d at 1126; *Fonda*, 707 F.2d at 438; *Sooner Products Co. v. McBride*, 708 F.2d 510, 512 (10th Cir.1983).

In the present case, Haupt asserts that the Defendants conspired to violate the following constitutional rights: 1) freedom from malicious prosecution, 2) freedom from unduly suggestive photographic identifications, 3) freedom from unreasonable searches and seizures, and 4) the right to have an attorney present during police interrogation. Complaint (# 1), p. 9. However, Haupt has been unable to demonstrate that any such constitutional violations occurred. Haupt also fails to articulate how each of the Defendants were part of a conspiracy to violate such rights. Given these defects, there is no basis with which to sustain Haupt's claim of conspiracy under § 1983. *See Woodrum*, 866 F.2d at 1126; *Fonda*, 707 F.2d at 438; *Sooner Products Co.*, 708 F.2d at 512.

## IX. PLAINTIFF'S STATE LAW CLAIMS

Finally, if a federal claim against a party is dismissed before trial, the pendent state law claims should be dismissed as well. *Schultz v. Sundberg*, 759 F.2d 714, 718 (9th Cir.1985); *Jones v. Community Redevelopment Agency*, 733 F.2d 646 (9th Cir.

1984). All of the federal claims sought by Plaintiff under the present Complaint will be dismissed. As a result, Haupt's remaining state law claims should also be dismissed without prejudice.

## ORDER

IT IS THEREFORE ORDERED that Defendants' Motion for Summary Judgment (# 62) is granted.

IT IS FURTHER ORDERED that Plaintiff's remaining pendent state claims be dismissed without prejudice.