Jonathan COWAN, Ph.D.,
Plaintiff–Appellant,

v.

UNIVERSITY OF LOUISVILLE
SCHOOL OF MEDICINE; Leah Dick-
stein, M.D.; Donald Kmetz, M.D.; and
Other Unknown Persons, Defendants–
Appellees.

No. 89–5677.

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 23, 1990.

Decided April 10, 1990.

Rehearing and Rehearing En Banc
Denied May 24, 1990.

Philip C. Kimball (argued) and J. Leonard Rosenberg, Louisville, Ky., for plaintiff-appellant.

Holland N. McTyeire (argued), Robert F. Matthews, Greenebaum, Doll & McDonald, Thomas H. Lyons, University Counsel, University of Louisville, Louisville, Ky., for defendants-appellees.

David A. Harris, Louisville, Ky., for defendant, Darrell Franks, M.D.

Before WELLFORD and GUY, Circuit Judges, and ENGEL, Senior Circuit Judge.

RALPH B. GUY, Jr., Circuit Judge.

The plaintiff, Jonathan D. Cowan, appeals entry of summary judgment in his suit alleging unlawful dismissal from the University of Louisville School of Medicine. Because plaintiff's claims against the University of Louisville are barred by the eleventh amendment to the United States Constitution, and all federal claims against defendants Leah Dickstein and Donald Kmetz are without merit, we affirm the district court's disposition of the case.

I.

Cowan's record of academic accomplishment before entering the University of Louisville School of Medicine is impressive.

After receiving B.S. and B.A. degrees from Brown University in 1970, Cowan held Danforth and Woodrow Wilson Fellowships while earning a Ph.D. in comparative pharmacology and toxicology from the University of California Medical Center. Plaintiff appears to have carried his academic success over to the study of medicine for the first few semesters in which he was enrolled at the University of Louisville. In fact, during this time, plaintiff was ranked in the top one quarter of his class. Things began to change, however, toward the beginning of 1982.

On February 11, 1982, Associate Dean for Student Affairs Leah Dickstein received a telephone call from a woman identifying herself as Phyllis Noe who indicated that she had recently ended a relationship with the plaintiff, and that since that time he had been harassing her. Three days later, Dickstein called Cowan's roommate to inquire into Cowan's psychological state. On February 15, 1982, Dr. Joseph LeRoy, the Director of Medical Student Education in Psychiatry, wrote Dickstein to express his concern with the plaintiff's clinical performance in a recently completed psychiatry clerkship rotation. Dr. LeRoy noted that plaintiff's performance was "in the doubtful to unsatisfactory range," particularly due to his inability to relate to either the patients or the nursing staff. On February 22, Dickstein received a letter from Steven Lippmann, M.D., Cowan's clinical supervisor during his psychiatry rotation. Lippmann requested that Dickstein contact the plaintiff to "remediate several apparent deficiencies," including Cowan's failure to practice medicine "within his expertise level," "[i]nadequate attention to, detail in, and performance of histories and physicals," and "difficulty maintaining productive patient, staff and peer relationships." That same day, Dickstein wrote Cowan to inform him that his reported behavior was "not in keeping with the standards of the University of Louisville nor of the medical profession at large." Dickstein requested that Cowan meet with her to discuss the matter further. At the meeting, Dickstein suggested to Cowan that he see one of several psychiatrists at the school to aid him in resolving his personal difficulties. Cowan chose to see Dr. Darrell Franks.

On March 12, 1982, Christopher Shields, M.D., wrote Dickstein to relate an incident in which Cowan exhibited behavior "totally inappropriate for a medical student." Cowan apparently had incorrectly informed the parents of a child with a malignant brain tumor that the child was receiving improper treatment, causing the parents a great deal of distress. Dickstein received yet another letter complaining about Cowan on April 21, 1982. Dr. Ennu Surrender, a resident in psychiatry, wrote that the plaintiff had seen patients after being advised not to, and had followed improper procedures leading to incorrect diagnoses.

After examining Cowan during five office visits, Dr. Franks wrote to Dickstein on April 10 that he considered the plaintiff's condition "to be very ominous." The letter continues as follows:

> I have serious doubts, in my professional opinion, as [to] the ability of this person to conform his conduct to that required by either the University o[r] the greater medical profession. In my opinion, he is a seriously disturbed person, and potentially dangerous to patients. I have serious reservations regarding his continuing in medical education.

Franks also expressed concern for Dickstein's personal safety, noting "strong reservations" regarding Dickstein seeing Cowan alone.

Dickstein showed Franks' letter to Dr. Donald Kmetz, the Dean of the School of Medicine. Kmetz then met with Cowan on April 21 and arranged for him to take a leave of absence until his personal and academic difficulties could be reviewed by the Medical School Student Affairs Committee.

The Student Affairs Committee (SAC), chaired by Dr. Bernard Weisskopf, met on April 29 to determine whether Cowan should take a medical leave of absence from the school. The SAC considered, among other things, the letters received by Dr. Dickstein, including the letter from Franks. Cowan appeared personally be-

fore the committee and presented a defense of his behavior. The SAC recommended to Dean Kmetz that Cowan be reinstated pending his submission to two independent psychiatric examinations to determine whether he was suffering from serious behavioral or emotional problems. Kmetz accepted the committee's recommendation and reinstated Cowan immediately. Cowan thereupon saw a psychiatrist and a psychologist, both of whom indicated that he had no "serious pathology." Cowan was present at the next meeting of the SAC on June 4, in which he again presented an explanation of his behavior. The committee also heard testimony from Dr. Martin Raff who presented material relating to Cowan's relationship with Phyllis Noe. The SAC notified Dr. Raff that this information was irrelevant to Cowan's competence to proceed with his medical studies and agreed to ignore the information. At the conclusion of the second meeting, the SAC took "no specific action against Dr Cowan" who requested that any disposition of the matter be delayed until he returned from a summer in California. The SAC never discussed the Cowan matter again, and Cowan was never disciplined for any aspect of his conduct.

From August 16, 1982, to October 15, 1982, plaintiff was enrolled in the clinical course of junior medicine, a part of the core curriculum required of all medical students at the University. Cowan received a failing grade in the course which was relayed to the Committee on Student Promotions (CSP) according to routine University procedure. The CSP recommended that Cowan not be dismissed immediately from the school but instead be allowed to repeat junior medicine and be placed on academic probation.

By letter dated October 28, Kmetz notified Cowan that he was upholding the recommendation of the CSP, but that further failure could result in Cowan's dismissal from the medical school as provided in the University catalog. The letter provides, in pertinent part:

> Because of your failure in a core course, you will be on academic probation throughout the 1982–83 academic year.

Failure to pass all your courses within this year could result in dismissal from school. . . .

Plaintiff's next rotation, from October 18 through December 17, 1982, was in junior surgery, another core course required for graduation. On January 6, 1983, plaintiff received a failing grade in junior surgery. Dr. Neal Garrison, the course director, testified that a student could fail junior surgery in any one of three ways: (i) by obtaining a failing score on the final examination; (ii) by failing the ward work component of the course; or (iii) by obtaining an average on the final examination and the ward work of less than 65%. This grading procedure was explained to all students at the beginning of the junior surgery class. Cowan failed the ward work with an extraordinarily low score, and also obtained a combined average of less than 65%. On January 6, two resident assistants who had been heavily involved in determining Cowan's ward grade wrote to Dr. Garrison explaining why they felt that Cowan's performance in the ward work component of junior surgery was unsatisfactory. The letter notes that Cowan's work was deficient in five separate respects: (i) he was unable to apply material taught in the classroom to the care of patients; (ii) he refused or was unable to accept responsibility; (iii) he was absent from the hospital while on call in direct contravention of a resident's request; (iv) he constantly complained of physical and mental fatigue; and (v) he resisted attending surgery for patients under his care. In addition, the letter notes that Cowan was unable to communicate with others "in a manner required for participation as a member of the medical community."

The letter goes on to explain that one of the residents met with Cowan two weeks into the rotation and delineated his specific areas of weakness, explaining that his performance was, at that time, "marginal at best" and that improvement was expected. These same admonitions were repeated to Cowan in a meeting with the chief and two junior residents one week later. At this time, Cowan was notified that "his per-

formance was failing and marked improvement would be needed for a passing score." Because no improvement was noted, the letter explains, Cowan received a failing mark.

The plaintiff requested and received several meetings to discuss his failing grade in junior surgery with Dr. Garrison, and with Dr. Hiram Polk, Chairman of the Department of Surgery.

The CSP met again on February 8, 1983, to discuss Cowan's second failure. Cowan was presented with notice of the hearing and given an opportunity to present extenuating circumstances to the committee. This time the CSP recommended, unanimously, with one abstention, that Cowan be dismissed from the medical school.

Contemporaneous with the CSP review, Polk and Garrison requested an independent evaluation of Cowan's junior surgery charts and notes from Dr. Phil Harbrecht, the Chief of Surgery at the Veterans Administration Hospital in Louisville. In a February 14 letter to Garrison, Harbrecht noted, *inter alia,* the following:

> In clarity, content, and assessment of the problems his notes are below average. For about half the patients reviewed they are too few. His written work therefore, cannot improve his evaluation if he was otherwise deficient.

Dr. Garrison also reviewed Cowan's written ward work and determined that it was inadequate and merited a failing grade. On February 22, the Department of Surgery held a faculty meeting at which Cowan's failure in junior surgery was reaffirmed.

After receiving the recommendation of the CSP and the faculty of the Department of Surgery, Kmetz independently reviewed Cowan's academic record and decided to affirm the recommendation for dismissal. Kmetz gave the following five reasons for his decision: (i) the recommendation of the CSP had been unanimous in favor of dismissal; (ii) both of Cowan's failures were in very important core clinical courses; (iii) the review of Cowan's clinical performance from prior rotations, as evidenced by the letters from Lippmann, LeRoy, Surrender,

and Shields, showed that his clinical work was marginal at best; (iv) Cowan's clinical evaluations in junior surgery were the lowest that he had ever seen; and (v) Cowan's cumulative grade was below that necessary to pass junior surgery.

The record is clear that the personal incidents culminating in Cowan's appearances before the SAC were not considered by either the CSP, the Department of Surgery, or Dr. Kmetz in the decision to dismiss Cowan. Dr. Kmetz responded to plaintiff's inquiries regarding the relationship of the SAC meetings to the final decision to dismiss as follows:

> My decision for dismissal had nothing to do with behavior, it had to do with performance as a medical student.
>
> . . . .
>
> ... [I] tried to take the Student Affairs issue and put it aside. I thought it had been addressed, and I tried to put it aside, not to mean that the Dr. LeRoy letter and the other letters that were generated as a result of academic performance, they should be taken into consideration. But those that were not related to his academic performance, in my personal judgment I tried to put those aside.... [My] best judgment is that I would have acted with the same decision had there been no issue of Student Affairs matters.

After his dismissal from the School of Medicine, Cowan filed eight grievances with the Student Academic Grievance Committee of the School of Medicine. The committee met on May 23, 1983, and June 1, 1983, to hear testimony in support of Cowan's complaints. Two closed sessions were held in which committee members discussed the evidence presented at the hearings. In its final report, the committee found insufficient evidence to support Cowan's allegations that his dismissal was unwarranted. Pursuant to these findings, Dean Kmetz reaffirmed his earlier decision to dismiss Cowan from the school.

On April 19, 1983, Cowan filed a complaint in a Kentucky circuit court against the University of Louisville School of Medicine and Dr. Darrell Franks. Cowan al-

leged that he was dismissed from the University based on communications from Franks, in "violation of his constitutionally vested student rights and civil rights and in derogation of his rights to procedural and substantive due process of law." Cowan also asserted claims for breach of contract, violation of school rules, and negligence.

On November 14, 1984, plaintiff instituted a second action in the United States District Court for the Western District of Kentucky based on the allegations set forth in his state court complaint. Cowan added Dr. Donald Kmetz and Dr. Leah Dickstein as defendants and narrowed his federal statutory claims to 20 U.S.C. § 1232g, the Family Educational Rights and Privacy Act (FERPA), and 42 U.S.C. §§ 1983 and 1985(3). He requested that the court hear all the aforementioned state law claims and an additional claim of conspiracy under the doctrine of pendent jurisdiction. The federal complaint also alleges that Cowan was required by the University to "submit to such administrative procedure and deprived of a property right without benefit of an opportunity to confront witnesses, to know the nature of the evidence against him [and] without assistance of counsel." Plaintiff demanded compensatory and punitive damages against the University, Kmetz, and Dickstein in a sum totaling $3,500,000 each. He did not request equitable relief.

Plaintiff's first action was removed to federal court and consolidated with the second by order dated December 31, 1986. The University of Louisville, Kmetz, and Dickstein subsequently filed a motion for summary judgment raising the defenses of sovereign and qualified immunity. By order dated May 1, 1989, the court granted the motion for summary judgment for the reasons set forth in an accompanying memorandum opinion.

The district court found plaintiff's action against the University of Louisville to be barred by the eleventh amendment to the Constitution as applied to the University of Louisville in our opinion in *Martin v. University of Louisville,* 541 F.2d 1171 (6th Cir.1976). The court then determined that

Kmetz and Dickstein were entitled to the protection of qualified immunity from suit under 42 U.S.C. § 1983. The court concluded its opinion with the following paragraph:

> Having found that the University is protected by sovereign immunity and that Dickstein and Kmetz have qualified immunity, the Court, for reasons of judicial economy[,] will not address other arguments raised by the plaintiff.

The court thereupon entered an order granting defendants' supplemental motion for summary judgment.

The plaintiff claims that the district court erred in granting summary judgment on eleventh amendment and qualified immunity grounds. Plaintiff also argues that the district court incorrectly failed to consider his state law claims. We address each of these arguments separately below.

## II.

### A. Claims Against the University of Louisville

It is well established that "a suit in federal court by private parties seeking to impose a liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment." *Quern v. Jordan,* 440 U.S. 332, 337, 99 S.Ct. 1139, 1143, 59 L.Ed.2d 358 (1979); *see also Edelman v. Jordan,* 415 U.S. 651, 663, 94 S.Ct. 1347, 1355, 39 L.Ed.2d 662 (1974). Only where Congress has explicitly abrogated a state's immunity to suit on the face of a statute, *see Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 242, 105 S.Ct. 3142, 3147, 87 L.Ed.2d 171 (1985), or where the state itself has consented to suit, *see Edelman,* 415 U.S. at 673, 94 S.Ct. at 1360, will a federal court have jurisdiction over a state defendant.

In *Martin v. University of Louisville,* 541 F.2d at 1174–77, this court explicitly determined that suits for money damages against the University of Louisville or its officers acting in their official capacities were barred by the eleventh amendment. The plaintiff does not contest the fact that Congress did not abrogate state sovereign

immunity to suit under 42 U.S.C. § 1983. *See Quern*, 440 U.S. at 341, 99 S.Ct. at 1145. He maintains, however, that Kentucky has consented to such suits against the University through a state statute providing for the purchase of insurance for University officials.

In *Dunlap v. University of Kentucky Student Health*, 716 S.W.2d 219, 220 (Ky. 1986), the Kentucky Supreme Court found that a Kentucky statute providing for the establishment of a special fund "to assure itself that health care malpractice claims or judgments against itself, or its agents will be satisfied," and providing that, "[s]uch purpose is hereby declared to be a public purpose for which public funds may be expended," Ky.Rev.Stat. § 164.939, effected a limited waiver of the state's sovereign immunity to suits for recovery from the fund. Plaintiff claims that a similar waiver has been effected with regard to suits against University personnel by Ky.Rev. Stat. § 164.2871. Plaintiff quotes the following language from that statute in his brief on appeal:

> The governing board of each state institution of higher education [is] authorized to purchase liability insurance for the protection of the individual members of the governing board, faculty, and staff of such institutions from liability for acts [and] omissions committed in the course and scope of the individual's employment or service. *Each institution may purchase the type and amount of liability coverage deemed to best serve the interest of such institution.*

(Appellant's Brief at 45) (emphasis added). What plaintiff fails to quote is the following 1988 amendment to the statute:

> [T]he purchase of liability insurance for members of governing boards, faculty and staff of institutions of higher education in this state *shall not be construed to be a waiver of sovereign immunity or any other immunity or privilege.*

Ky.Rev.Stat. § 164.2871(3) (emphasis supplied). This statute is hardly what the Supreme Court envisioned when it wrote "we will find waiver only where stated 'by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction.'" *Edelman*, 415 U.S. at 673, 94 S.Ct. at 1361 (quoting *Murray v. Wilson Distilling Co.*, 213 U.S. 151, 171, 29 S.Ct. 458, 464, 53 L.Ed. 742 (1909)). Needless to say, we find plaintiff's argument that Kentucky has consented to this suit unconvincing.

Because the eleventh amendment is an "explicit limitation on federal judicial power," *Edelman*, 415 U.S. at 678, 94 S.Ct. at 1363 (quoting *Ford Motor Co. v. Department of Treas. of Indiana*, 323 U.S 459, 467, 65 S.Ct. 347, 352, 89 L.Ed. 389 (1945)), a federal court is without jurisdiction to hear a claim against an unconsenting state absent congressional abrogation. *See Pennsylvania v. Union Gas Co.*, — U.S. —, 109 S.Ct. 2273, 2277, 105 L.Ed.2d 1 (1989); *Atascadero*, 473 U.S. at 242, 105 S.Ct. at 3147. All plaintiff's claims against the University of Louisville and its officers acting in their official capacities were, therefore, properly dismissed for lack of jurisdiction. *See Alabama v. Pugh*, 438 U.S 781, 782, 98 S.Ct. 3057, 3058, 57 L.Ed.2d 1114 (1978) (per curiam) (ordering dismissal of state defendant sued under 42 U.S.C. § 1983 because "the Eleventh Amendment prohibits federal courts from entertaining suits by private parties against States and their agencies"). *Id.* at 781, 98 S.Ct. at 3057.[1]

---

**1.** We note that insofar as plaintiff asserts federal constitutional violations under 42 U.S.C. § 1983 against the University of Louisville, his complaint fails to state a claim upon which relief can be granted. As noted above, *Martin v. University of Louisville*, 541 F.2d at 1174–75, held that the University of Louisville is a Kentucky state agency. The Supreme Court has held that such a state agency is *not* a "person" within the meaning of 42 U.S.C. § 1983. *See*

*Will v. Michigan Dep't of State Police*, — U.S. —, 109 S.Ct. 2304, 2311, 105 L.Ed.2d 45 (1989). With regard to plaintiff's FERPA claim, he concedes that "no private right of action exists within the FERPA itself." Plaintiff claims only that the University of Louisville's failure to comply with FERPA provides him with a claim under 42 U.S.C. § 1983. Our disposition of plaintiff's section 1983 claim, as barred by the eleventh amendment, and the Supreme Court's

### B. Federal Law Claims Against Dickstein and *Kmetz* In Their Individual Capacities

■ Cowan alleges that Dickstein and Kmetz violated his federal constitutional rights to due process and equal protection of the laws, and hence that they are liable for damages under 42 U.S.C. § 1983. Plaintiff claims that he was deprived of a liberty interest in his reputation when Dickstein and Kmetz disclosed the letter written by Franks to the SAC. He then asserts that he was deprived of a "property interest in his continuing enrollment in medical school." (Appellant's Brief at 35).

Due process concerns are clearly not implicated in Dickstein's and Kmetz's actions with regard to the letter from Franks. In the case of *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), the Supreme Court explained that a plaintiff claiming to have suffered damage to his reputation due to the actions of a state official had failed to state a claim for deprivation of liberty within the meaning of the due process clause. The Court set forth its decision in the following passage which we find dispositive of Cowan's claim here:

> Kentucky law does not extend to respondent any legal guarantee of present enjoyment of reputation which has been altered as a result of petitioners' actions. Rather his interest in reputation is simply one of a number which the state may protect against injury by virtue of its tort law, providing a forum for vindication of those interests by means of damages actions. And any harm or injury to that interest, even where as here inflicted by an officer of the State, does not result in a deprivation of any "liberty" or "property" recognized by state or federal law, nor has it worked any change of respondent's status as theretofore recognized under the State's laws. For these reasons we hold that the interest in reputation asserted in this case is neither "liberty" nor "property" guaranteed against state deprivation without due process of law.

424 U.S. at 711–12, 96 S.Ct. at 1165.

The gravamen of plaintiff's argument that he was deprived of property without due process is that Dickstein and Kmetz engineered his dismissal from the School of Medicine because of a personal vendetta they were carrying on against him. Cowan alleges that both defendants, together with many other "agents" of the University of Louisville, conspired to have him dismissed because of their own irrational fears of him, and in order to placate Dr. LeRoy who, Cowan alleges, was a rival for Noe's affections. When this plot failed, Cowan maintains, the defendants and other "unnamed agents of the University of Louisville," proceeded to "fake" Cowan's academic failure in junior surgery. The facts surrounding plaintiff's dismissal from the School of Medicine are as we have set them out above; we find no support there for plaintiff's fanciful conspiracy theory.

In *Rice v. Ohio Department of Transportation*, 887 F.2d 716, 719 (6th Cir.1989), we declared our unwillingness to allow a plaintiff to circumvent Congress' intent that states not be sued under 42 U.S.C. § 1983 " 'by a mere pleading device.' " (Quoting *Will v. Michigan Dep't of State Police*, —— U.S. ——, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989)). In *Rice*, we stated that:

> [T]he record does not suggest in any way that the defendants' actions were somehow unofficial. The capacity in which the individual defendants were in fact acting is what matters, not the capacity in which they were sued....

887 F.2d at 719. In the case before us, we see no evidence whatsoever that either Dickstein or Kmetz were acting in anything other than their official capacities, and therefore are unwilling to engage in a review of the process accorded plaintiff in his dismissal from medical school. To do so would be to, in effect, entertain plaintiff's claim against the University of Louisville—a task which the eleventh amendment, and the principles of sovereign im-

holding in *Will* therefore disposes of the FERPA claim as well.

munity it implies, removes from our jurisdiction.

### C. State Law Claims

After granting summary judgment on plaintiff's federal constitutional and statutory claims, the district court ignored plaintiff's state law claims, writing "for reasons of judicial economy [the court] will not address other arguments raised by the plaintiff." We find it unclear from this statement whether the court intended that the state law claims be remanded to state court. *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Since we are uncertain, we feel that the most appropriate resolution of this question is to remand to the district court so that the district judge can indicate whether the state claims should be remanded or kept for disposition.

The decision of the district court is AFFIRMED. However, the case is REMANDED for the limited purpose of allowing the district court to clarify its ruling relative to the pendent state claims.

WELLFORD, Circuit Judge, concurring.

I concur with most of Judge Guy's thoughtful discussion of the issues in this case. I am fully in accord with Part IIA and C and the rationale with respect to the claims against the University of Louisville and the state law claims. I agree also with the statement in Part IIB that "[d]ue process concerns are clearly not implicated in Dickstein's and Kmetz's actions with regard to the letter from Franks." I agree further that there is "no support ... for plaintiff's fanciful conspiracy theory."

I find no necessity, however, to adopt the statement quoted from *Rice v. Ohio Department of Transportation,* 887 F.2d 716, 719 (6th Cir.1989), which may be interpreted to mean that the doctrine of *Will v. Michigan Department of State Police,* —— U.S. ——, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989), somehow bars suits under § 1983 against state officials when those officials are being sued in their individual capacities. I do not view *Will* as barring § 1983 suits against state officials whenever the suits concern *actions* taken in their official capacities. Instead, I believe that *Will* bars suits against state officials only when those officials are *sued* in their official capacities.

Accordingly, I would affirm the decision of the district court that under the facts of this case defendants Dickstein and Kmetz enjoy qualified immunity.