996

Stanley R. HUTSELL, Plaintiff–
Appellant,

v.

Ray SAYRE, Badge No. 6545, individually
and in his capacity as an officer of the
University of Kentucky Police Depart-
ment; W.A. Hayes, Badge No. 6217, indi-
vidually and in his capacity as an officer
of the University of Kentucky Police De-
partment; and The Board of Trustees of
The University of Kentucky, Defen-
dants–Appellees.

No. 92–6216.

United States Court of Appeals,
Sixth Circuit.

Argued June 15, 1993.

Decided Sept. 29, 1993.

William C. Jacobs, Catherine M. Stevens (argued and briefed), Lexington, KY, for plaintiff-appellant.

John C. Darsie, Jr., Office of Legal Counsel University of Kentucky, Stephen L. Barker (argued and briefed), Phillip M. Moloney, Sturgill, Turner & Truitt, Lexington, KY, Walter G. King, John T. Ballantine, Ogden, Newell & Welch, Louisville, KY, Paul C. Van Boven, University of Kentucky Office of Legal Counsel, Lexington, KY, for defendants-appellees.

Before: NELSON and SUHRHEINRICH, Circuit Judges, and EDMUNDS, District Judge.*

SUHRHEINRICH, Circuit Judge.

In this § 1983 action, plaintiff Stanley R. Hutsell alleges that defendants University of Kentucky police officers Ray Sayre and W. A. Hayes, as well as the Board of Trustees of the University of Kentucky ("UK"), violated his Fourth and Fourteenth Amendment rights by seeking an arrest warrant without probable cause for an assault of a female student on the UK campus. The district court ruled that plaintiff's claims against UK and the officers in their official capacities were barred by the Eleventh Amendment,

---

* The Honorable Nancy G. Edmunds, United States District Judge for the Eastern District of Michigan, sitting by designation.

and that the officers were entitled to qualified immunity in their individual capacities. For the reasons that follow, we **AFFIRM.**

## I.

UK student Stacey Prieshoff was assaulted by an unknown assailant on Saturday, September 22, 1990, between 1:30 and 2:00 a.m., on the university campus. Defendant UK police officers, Sayre and Hayes were dispatched to the scene shortly after the assault occurred.

Officer Sayre took Prieshoff to the UK Medical Center for examination and treatment of a gash in the back of her head. Prieshoff told Sayre that her assailant struck her in the back of the head with "something." She described her assailant as a black male, 5'10", 170 pounds, medium build, black short afro, stubble on his face, ruddy complexion, no glasses, and wearing a dark jacket, a light colored shirt, and blue jeans.

While Sayre and Prieshoff were at the hospital, Hayes investigated the scene of the assault. Two individuals, Michael Fox and Darren Birch, handed Hayes a white bandanna, a shoe and a wallet which they found on the ground. Prieshoff identified the bandanna and the shoes as hers. The wallet contained plaintiff's driver's license and his Lexington transit identification card.

At approximately 5:30 a.m. that morning, Hayes telephoned plaintiff's residence, but received no response. Later that morning, two other officers went to two addresses listed on plaintiff's identification cards. Hutsell was at neither. The pair then proceeded to the Lexington Transit Bus Garage where plaintiff worked. They were informed that he was not scheduled to work that day.

The next day, September 23, 1990, Prieshoff went to the UK Police Department to assist in the construction of a composite drawing of her assailant. Sayre testified that Prieshoff identified her assailant as Negro, male, between 21 and 25 years of age, medium build, and black hair. At the time, plaintiff, a black male, was 44 years old, with balding gray hair and a mustache.

On September 24, 1990, Hayes ran a criminal history check on plaintiff, which revealed that plaintiff had a previous arrest for criminal solicitation-prostitution. Hayes obtained a photograph of plaintiff from Lexington Metro Central Records and, with the assistance of Lexington–Fayette Urban County Police Department, prepared a photographic lineup of plaintiff and five other black males with a history of arrests or convictions for sexual offenses, and who resembled plaintiff in appearance.

That afternoon, Hayes went to Prieshoff's apartment with the photographic lineup. Prieshoff selected plaintiff's photograph as most resembling her assailant; however, she told Hayes that she could not be "100% certain" because it was more difficult to identify someone in a photograph than in person. Prieshoff explained "that was the person, you know, out of the line-up [sic], I was drawn to that picture and I felt that, you know, he was—he was the one."

Also on the morning of the 24th, Hayes reached plaintiff by telephone, informed him that his wallet had been found and requested that plaintiff come to the station to identify it. When Hutsell appeared, he was advised that he was a suspect in an attempted rape and was advised of his rights. Plaintiff agreed to be interviewed by Hayes and Sayre. He told the officers that his wallet had been missing since Thursday, September 20, 1990. Plaintiff stated that he thought he had lost it at the UK hospital while visiting his wife, who was a patient there. Sayre subsequently checked the hospital's records; plaintiff's wife had not been a patient there since 1986. Plaintiff also consented to a search of his vehicle. The search of his vehicle revealed a baseball bat and work gloves in his trunk.

Hayes's involvement on the case ended on September 26, 1990. Sayre continued to investigate the matter. He interviewed Fox, who told Sayre that Prieshoff had stated that a black man attempted to rape her and struck her in the back of the head with "a bat or something like that."

Based upon this information, Sayre approached Fayette District Judge Thomas Clark in order to obtain a criminal complaint against plaintiff. Judge Clark issued a war-

rant for plaintiff's arrest on December 14, 1990, after reviewing Sayre's affidavit and revised complaint.

Plaintiff was indicted and tried in state court. On March 26, 1991, he was acquitted of the charge of Criminal Attempt, Rape 1st Degree. Plaintiff brought this suit on September 23, 1991, in federal court under 42 U.S.C. § 1983, alleging that UK and its agents, Hayes and Sayre, violated his Fourth and Fourteenth Amendment rights by obtaining an arrest warrant without probable cause and seeking money damages. The district court dismissed the action and this appeal followed.

## II.

## A.

■ Because plaintiff's suit implicates the Eleventh Amendment, which presents a potential jurisdictional bar,[1] and Congress has not abrogated state sovereign immunity in suits under 42 U.S.C. § 1983, *Cowan v. University of Louisville School of Medicine*, 900 F.2d 936, 940–41 (6th Cir.1990) (citing *Quern v. Jordan*, 440 U.S. 332, 341, 99 S.Ct. 1139, 1145, 59 L.Ed.2d 358 (1979)), we begin our analysis here. It is well-settled that " 'a suit in federal court by private parties seeking to impose a liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment.' " *Cowan*, 900 F.2d at 940 (quoting *Quern*, 440 U.S. at 337, 99 S.Ct. at 1143).[2] This bar against suit also extends to state officials acting in their official capacities. *See Kentucky v. Graham*, 473 U.S. 159, 167, 105 S.Ct. 3099, 3106, 87 L.Ed.2d 114 (1985).

■ When suit is brought against a public agency or institution, and/or its officials, "the application of the Eleventh Amendment turns on whether said agency or institution can be characterized as an arm or alter ego of the state, or whether it should be treated instead as a political subdivision of the state." *Hall v. Medical College of Ohio at Toledo*, 742 F.2d 299, 301 (6th Cir.1984) (citing *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280, 97 S.Ct. 568, 572, 50 L.Ed.2d 471 (1977)), *cert. denied*, 469 U.S. 1113, 105 S.Ct. 796, 83 L.Ed.2d 789 (1985). *See also Estate of Ritter v. University of Mich.*, 851 F.2d 846, 848 (6th Cir.1988) (federal question of whether the Eleventh Amendment is applicable entails consideration of the status of the state agency under state law). The most important factor in resolving this question, however, is whether any monetary judgment would be paid out of the state treasury. *Ritter*, 851 F.2d at 850 (citation omitted).

■ That UK is considered an arm of the state under state law and not merely a political subdivision is apparent from the statutory scheme which governs it. To begin with, the university's statutory existence is found in Chapter 164 of the Kentucky Revised Statutes, which is entitled "State Universities and Colleges; Regional Education; Archaeology." It is required by statute that UK "be maintained by the state with such endowments, incomes, buildings and equipment as will enable it to do work," Ky.Rev. St.Ann. § 164.100, and that it "shall be the principal state institution for the conduct of statewide research and statewide service programs and shall be the only institution authorized to expend state general fund appropriations on research and service programs of a statewide nature financed principally by state funds." Ky.Rev.Ann. § 164.125(2). *Cf. Hall*, 742 F.2d at 303 (MCO is included in definition of "state university or college" found in

---

1. The "atypical" jurisdictional bar of the Eleventh Amendment concerns individual claims, not entire cases. *Henry v. Metropolitan Sewer Dist.*, 922 F.2d 332, 337 (6th Cir.1990) (citations omitted).

2. The Eleventh Amendment provides:

 The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of Any Foreign State.

 U.S. Const. amend. XI. Although the text of the amendment suggests that only citizens of another state are barred from suing a state in federal court, it has long been held that the amendment also prohibits suits by a citizen against his own state. *Papasan v. Allain*, 478 U.S. 265, 276, 106 S.Ct. 2932, 2939, 92 L.Ed.2d 209 (1986) (citing *Hans v. Louisiana*, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890)).

§ 3345.12(A)(1), and the school is governed by the provisions of Revised Code chapter 3345, entitled "State Universities—General Powers").

More importantly, any claim for money damages against the UK, to the extent authorized, is classified by statute as a claim against the state treasury. Chapter 44, "Claims Upon the Treasury," states in pertinent part that:

· **44.073. State institutions of higher education declared agencies of state government; jurisdiction of board of claims; sovereign immunity.** (1) *For purposes of KRS 44.072, state institutions of higher education under KRS Chapter 164 are agencies of the state.* (Emphasis added).

3. The doctrine of state sovereign immunity "has enjoyed a long and well-established history in Kentucky," *Kestler v. Transit Auth. of N. Ky.*, 758 S.W.2d 38, 39 (Ky.1988), and is "deeply implanted in the law of the Commonwealth through Section 231 of the Kentucky Constitution." *Id. See also Kentucky Ctr. for the Arts Corp. v. Berns*, 801 S.W.2d 327, 329 (Ky.1990) (Kentucky Constitution does not by its express terms elevate common law sovereign immunity to the status of a constitutional principle, but § 231 is recognized as constitutionally protecting sovereign immunity in "suits against the Commonwealth" because otherwise it has no meaning). Section 231 of the Constitution provides that "[t]he General Assembly may, by law, direct in what manner and in what courts suits may be brought against the Commonwealth." Thus, § 231 authorizes the General Assembly to limit or eliminate the protection of sovereign immunity to the extent it exists, whenever its deems it necessary. *Berns*, 801 S.W.2d at 329; *Kestler*, 758 S.W.2d at 39.

4. Ky.Rev.St.Ann. § 44.072 reads in full:

**44.072. Legislative intent as to sovereign immunity in negligence claims.** It is the intent of the general assembly to provide the means to enable a person negligently injured by the Commonwealth, any of its cabinets, departments, bureaus, or agencies, or any of its officers, agents or employes while acting within the scope of their employment by the Commonwealth or any of its cabinets, departments, bureaus or agencies to be able to assert their just claims as herein provided. *The Commonwealth thereby waives the sovereign immunity defense only in the limited situations as herein set forth. It is further the intention of the general assembly to otherwise expressly preserve the sovereign immunity of the Commonwealth, any of its cabinets, departments, bureaus or agencies or any of its officers, agents or em-*

Section 44.072 authorizes claims for negligence against the Commonwealth, or any of its agencies, departments, officers or employees, but expressly reserves sovereign immunity[3] "in all situations except where sovereign immunity is specifically and expressly waived as set forth by statute." Ky.Rev.St. Ann. §§ 44.072;[4] 44.073(8).[5] *See also* Ky. Rev.St.Ann. §§ 164.939–.944 (creating insurance fund for health care malpractice claims or judgments against university "itself" or its agents). *Cf. Ritter*, 851 F.2d at 849 (finding significant that if this case had been litigated in state judicial system, it would have been required to be litigated in the court of claims, as a claim against the state for retroactive monetary relief).[6]

*ploys while acting in the scope of their employment by the Commonwealth or any of its cabinets, departments, bureaus or agencies in all other situations except where sovereign immunity is specifically and expressly waived as set forth by statute.* The board of claims shall have exclusive jurisdiction to hear claims for damages, except as otherwise specifically set forth by statute, against the Commonwealth, its cabinets, departments, bureaus, agencies or any of its officers, agents or employes while acting within the scope of their employment by the Commonwealth, its cabinets, departments, bureaus or agencies. (Emphasis added).

5. Ky.Rev.St.Ann. § 44.073(8) states:

(8) No action for negligence may be brought in any court or forum other than the board of claims against the Commonwealth, any of its cabinets, departments, bureaus or agencies or any of its officers, agents or employes while acting within the scope of their employment by the Commonwealth, or any of its cabinets, departments, bureaus or agencies.

6. The legal climate in which Ky.Rev.St.Ann. §§ 44.072 and 44.073 was enacted further supports this conclusion. In 1986, the Kentucky Supreme Court held in *Dunlap v. University of Ky. Student Health Services Clinic*, 716 S.W.2d 219 (Ky.1986), that the UK Medical Center Malpractice Insurance Act constituted a partial waiver of sovereign immunity for the hospital to the extent that an insurance fund for health care malpractice claims or judgments had been provided for by statute. The statute at issue read:

*Legislative purpose*—It is the purpose of KRS 164.939 to 169.944 to promote the health and general welfare of the people of the Commonwealth by authorizing the University of Kentucky to establish from its own funds other than general tax revenues a basic coverage compensation fund *to assure itself* that health

Section 164.2871 of the Kentucky Revised Statutes, which allows UK to purchase liability insurance for its individual trustees, faculty and staff, does not alter the analysis. That section explicitly states that except as provided in Chapter 44, the purchase of liability insurance by the governing board, of each state institution for members of governing boards, faculty and staff, *shall not be construed to be a waiver of sovereign immunity or any other immunity or privilege.* Ky.Rev.St.Ann. § 164.2871(3) (as amended in 1988) (emphasis added). In *Cowan,* 900 F.2d 936, which involved a suit against the University of Louisville School of Medicine for wrongful dismissal, we stated with respect to the foregoing emphasized language:

> This statute is hardly what the Supreme Court envisioned when it wrote "we will find waiver only where stated 'by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction.'" *Edelman,* 415 U.S. at 673, 94 S.Ct. at 1361 (quoting *Murray v. Wilson Distilling Co.,* 213 U.S. 151, 171, 29 S.Ct. 458, 464, 53 L.Ed. 742 (1909)). Needless to say, we find plaintiff's argument that Kentucky has consented to this suit unconvincing.

*Cowan,* 900 F.2d at 941. Given that UK also qualifies as "a state institution of higher education," our interpretation of § 164.2871 applies with equal force here.

In support of his argument that UK is not a state agency for purposes of Eleventh Amendment immunity, plaintiff relies on *Kentucky Ctr. for the Arts Corp. v. Berns,* 801 S.W.2d 327 (Ky.1990).[7] In *Berns,* the plaintiff sued for negligence in state court, the Kentucky Center for the Arts ("KCA") after he slipped and fell on KCA's premises. The Kentucky Supreme Court held that KCA is not under the "direction and control of the central state government" and can not therefore be considered the "Commonwealth" under the Kentucky Constitution for purposes of sovereign immunity. The court reasoned that KCA was created to "serve as a catalyst in the development of Louisville and Jefferson County as a major convention and entertainment center ...," Ky.Rev.St.Ann. § 153.-410, and was "not created to discharge any 'governmental function' in the context in which § 231 of the Constitution was written." *Berns,* 801 S.W.2d at 330. The court noted that KCA was a "body corporate with full corporate powers," *id.* (quoting Ky.Rev.St. Ann. § 153.420), to "issue revenue bonds solely payable from the charges, revenues, rentals and other funds pledged for their payment"; to levy a surcharge on tickets to contribute to revenue; and to "have exclusive control of all exhibitions, performances and concessions in the center." *Id.* Additionally, all funds and monies collected by KCA were to be turned over to KCA to be used to defray its costs. *Id.*

The court therefore concluded that KCA, which performs substantially the same func-

care malpractice *claims or judgments against itself,* or its agents will be satisfied. Such purpose is hereby declared to be a public purpose for which public funds may be expended. *Dunlap,* 716 S.W.2d at 220 (quoting Ky.Rev.St. Ann. § 164.939; emphasis supplied by *Dunlap* court). The *Dunlap* court stated that "[f]rom the words of this statute, a limited legislative waiver is plain in its meaning and intent. The only question is whether the statutory language is so imprecise that it fails to accomplish its purpose." *Id.* The court observed that the statutory scheme authorized the Board of Trustees, in its discretion, to create and maintain a basic coverage compensation fund for itself and its agents, to be used "solely in payment of claims for liability arising in favor of any patient" treated by the university or its agents. *Id.* The court rejected the defendant's position that the language of the statute meant only that the fund was intended to provide coverage of physicians and other em-

ployees, but not for claims directly against the university, since the Act "specifie[d] in three or more places that it is intended to provide a fund for the University to pay claims against 'itself' as well as its agents." *Id.* at 221.

In direct response to *Dunlap,* the General Assembly enacted § 44.072 and § 44.073. *University of Louisville v. O'Bannon,* 770 S.W.2d 215, 216 (Ky.1989). The specificity of these statutes leads to the conclusion that the General Assembly wished to insulate UK, and therefore the Commonwealth from suit in all but very limited circumstances, none of which are at issue here.

7. According to *Berns,* sovereign immunity extends only to those agencies "which are under the direction and control of the central State government and are supported by monies which are disbursed by authority of the Commissioner of Finance out of the State treasury." *Berns,* 801 S.W.2d at 331.

tions as any private business engaged in the entertainment business, "albeit in the name of promoting tourism and thus the economic welfare of Louisville and Jefferson County" compelled the conclusion that "our constitutional fathers would not view this activity as qualifying for sovereign immunity." 801 S.W.2d at 331.[8]

We are not persuaded. In contrast with entertainment, higher education has long been recognized as a governmental function. *Hall*, 742 F.2d at 305; *Ranyard v. Board of Regents*, 708 F.2d 1235, 1239 (7th Cir.1983) (and citations therein). Although UK's Board of Trustees is designated as a "body corporate," it does not have "full" corporate powers like KCA. Further, unlike KCA, UK "shall be maintained by the state" through endowments and incomes. Ky.Rev.St.Ann. § 164.100. *Cf. Hall*, 742 F.2d at 304 (noting that Ohio legislature is required to support Medical College of Ohio " 'by such sums and in such manner as it may provide, but "[s]upport may also come from other sources" ' " (quoting Ohio Rev.Code Ann. § 350.05)). All monies collected by UK are deemed "state funds." *See* Ky.Rev.St.Ann. § 446.010(31),[9] to be placed in a "depository bank," designated by the treasurer of the Commonwealth "as appropriate for receiving public moneys." *Id.* § 164A.550(4). We viewed a similar configuration under *Hall* as merely a convenience, not as an abdication of state control over such funds. *See Hall*, 742 F.2d at 304 ("By statute, the Ohio legislature *permits* state colleges and universities to retain such funds, rather than require them to be paid into the treasury and then appropriated back to the schools as needed, but it could just as

easily amend the statute to require the converse.").

Unlike KCA, and contrary to plaintiff's assertion, the Board of Trustees does not operate independently of the central state government. As pointed out by defendant, policy-making for the university is vested in the State Council on Higher Education, not the Board. *See* Ky.Rev.St.Ann. § 164.020(1)–(9). UK as a state university reports through the State Council on Higher Education to the Office of the Governor. Ky.Rev.St.Ann. § 12.028(1). Finally, UK's finances, as earlier noted, are considered state funds, and its budget is submitted and approved by the legislature as part of the Governor's executive budget. Ky.Rev.St.Ann. § 164.020(4)(c). Once budgeted, UK receives an appropriation from the state treasurer in "any amounts due by virtue of the state appropriation." Ky.Rev.St.Ann. § 164A.555. A statutory scheme then dictates how the UK is to manage its budget and appropriate funds. *See* Ky.Rev.St.Ann. §§ 164A.550–.630. Thus, we believe that even under a *Berns* analysis, UK would be considered an arm of the state for purposes of state sovereign immunity. *See United States Pipe & Foundry Co. v. Johnson*, 927 F.2d 296, 298 (6th Cir.1991) (although not dispositive, state law immunity is given great weight by federal court in determining Eleventh Amendment immunity).

■ In summation, we conclude that a suit against the UK Board of Trustees and its employees in their official capacity is fairly characterized as a suit against the "state" for purposes of Eleventh Amendment immunity. The district court therefore properly dis-

---

8. In *dicta*, the *Berns* court stated that the language in Ky.Rev.St.Ann. § 153.430(3), "directing the procurance of insurance," despite § 44.073, did not change the rule of *Taylor v. Knox County Bd. of Educ.*, 292 Ky. 767, 167 S.W.2d 700 (1942) and *Green River Dist. Health Dep't v. Wigginton*, 764 S.W.2d 475 (Ky.1989), and *Kestler v. Transit Auth. of N. Ky.*, 758 S.W.2d 38 (Ky.1988), cases deciding there was a statutory waiver because of statutes authorizing or directing the purchase of liability insurance.

In both *Wigginton* and *Kestler*, however, the causes of action accrued before the enactment of

Ky.Rev.St.Ann. §§ 44.072 or 44.073, which was held to have no retroactive application.

9. "State funds" or "public funds" are defined as:

[S]ums actually received in cash or negotiable instruments from all sources unless otherwise described by any state agency, state-owned corporation, university, department ... whether or not the money has ever been paid into the treasury and whether or not the money is still in the treasury if the money is controlled by any form of state organization....
Ky.Rev.St.Ann. § 446.010(31).

missed the claims against UK and its officials.[10]

## B.

■ This leaves plaintiff's claim against the officers in their individual and personal capacities, for which the Eleventh Amendment provides no immunity. *Hafer v. Melo*, —— U.S. ——, ——, 112 S.Ct. 358, 364, 116 L.Ed.2d 301 (1991); *Scheuer v. Rhodes*, 416 U.S. 232, 237, 94 S.Ct. 1683, 1687, 40 L.Ed.2d 90 (1974); *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Moreover, because they are sued in their individual capacities, defendants are considered "persons" within the meaning of § 1983. *Hafer*, —— U.S. at —— – ——, 112 S.Ct. at 362–63.

■ Defendants may, however, assert the defense of qualified immunity to the extent that their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The proper analysis for a defendant's entitlement to qualified immunity consists of: (1) whether the plaintiff has asserted a violation of known civil constitutional right; and (2) whether the constitutional right was so clearly established at the time in question that a reasonable official in the defendant's position would have known that he was violating the plaintiff's constitutional rights. *Siegert v. Gilley*, 500 U.S. 226, ——, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991). A court must rule in the affirmative on the first issue before considering the second. *Id.* Our review is de novo. *Henry v. Metropolitan Sewer Dist.*, 922 F.2d 332, 339 (6th Cir.1990).

■ Plaintiff claims that the manner in which defendants investigated his involvement in the assault on Prieshoff, which culminated in his being charged with and tried for attempted rape in the first degree, violated clearly-established constitutional rights of which a reasonable officer would have known. Plaintiff attacks: (1) the affidavit signed by Sayre when he applied for plaintiff's arrest warrant, which plaintiff claims failed to es-

tablish probable cause; and (2) the photographic identification procedure used by Hayes as impermissibly suggestive. We address each specific contention in turn.

### 1.

■ If a police officer obtains a warrant through material false statements made either knowingly or in reckless disregard for the truth, he may be sued for under § 1983 for a Fourth Amendment violation. *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir.1989) (citations omitted). Police officers are entitled qualified immunity however, unless the warrant is so utterly lacking in probable cause that no officer of reasonable competence would have concluded that a warrant should issue. *Malley v. Briggs*, 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986); *Yancey v. Carroll County*, 876 F.2d 1238, 1243 (6th Cir.1989).

Plaintiff's attack on the affidavit is threefold: (1) that a reasonable officer in Sayre's position would have known that the portion of the affidavit swearing that "the Complainant advises that she was struck from behind ... by a subject she later identified" does not provide enough facts for a reasonable judicial officer to conclude that Prieshoff identified plaintiff; (2) that a reasonable officer would have known that the complaint, by omitting plaintiff's name in the charging portion, failed to identify plaintiff as the individual to be charged with the claimed offense; and (3) assuming the affidavit did identify plaintiff as the subject Prieshoff later identified, a reasonably well-trained officer in Sayre's position would have known that statement to be false.

As to the sufficiency of the affidavit, Sayre testified that Fayette County Judge Clark was present (although in and out) while Sayre was preparing the affidavit and complaint, and asked him questions about the case. Sayre stated that his first complaint included information that plaintiff's wallet was found at the scene of the crime where a young lady was attacked, that Prieshoff identified plaintiff as her assailant out of a photo-

---

**10.** We also note that the state is not considered a "person" under § 1983. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989).

graphic lineup, that after the incident plaintiff could not be located at his address, and that plaintiff gave inconsistent statements during the investigation. Sayre also testified that Judge Clark reviewed the first complaint and instructed Sayre to shorten the complaint to "just specifically what happened and specifically where it happened and who was involved." We believe it a reasonable assumption of probable cause to apply for an arrest warrant existed here, given the facts allegedly contained in the original complaint; and that a reasonable officer in Sayre's shoes would have gone forward with the revised complaint after he had been explicitly instructed by a judge to shorten it after the judge had reviewed the original. Absent any evidence from plaintiff to create a genuine issue of fact that Judge Clark did not have full information, we conclude that the district court's ruling was proper. *Cf. Yancey*, 876 F.2d at 1243 (material issue of fact existed as to whether probable cause for issuance of search warrant would have existed but for disputed statement of police officer where issuing judge expressed uncertainty in his deposition as to what he was told by officer).

Plaintiff's assertion that the charging portion of the criminal complaint were insufficient to establish probable cause is patently ridiculous. Plaintiff's name appeared at the top of the single page document and that the blank space was immediately preceded by the wording "the above named." [11] Its meaning was clear.

The gist of plaintiff's third argument is that a reasonable officer would have known that the statement that Prieshoff "identified" complainant was false and intentionally reckless because Sayre knew before filing the affidavit that (1) Prieshoff had not positively identified plaintiff, but had stated that she was not 100% sure of the identification, absent hearing and seeing the suspect; (2) Prieshoff had described her assailant as a 21–25 year old black male without a mustache and that plaintiff was a 44–year–old, graying, balding, black male with a mustache.

Although Prieshoff's description was not identical to that of plaintiff's, it was not so far off the mark as to render the statement in the affidavit in reckless disregard for the truth. *See Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (affidavits are to be evaluated in common sense, rather than hypertechnical manner). The statement was bolstered by Sayre's additional knowledge that: (1) plaintiff's wallet was found at the scene of the assault; (2) plaintiff could not be located on the morning of the attack; (3) he had been previously arrested for a sexual offense; (4) the assault victim identified plaintiff in a photographic lineup; (5) plaintiff had given inconsistent statements to investigating officers; and that, (6) plaintiff had a baseball bat in his trunk and that UK student Fox had stated that Prieshoff thought she had been hit with a bat. In the face of all this information, Sayre clearly had sufficient indicia of probable cause to believe that plaintiff had committed the crime. The district court correctly determined that plaintiff failed to raise genuine issues of material fact that the statements made in the affidavit were false or in reckless disregard of the truth. *See Yancey*, 876 F.2d at 243 (generally presence of probable cause is jury question unless there is only one reasonable determination).

**2.**

■ Plaintiff argues that the composite Prieshoff constructed of her assailant would have ruled him out as a subject; and secondly, that plaintiff's photo "stood out" because his mustache was less prominent than the others, his skin tone much darker, and that some of the other photos were obscured by dark shadows.

The Supreme Court has held that whether a defendant's due process rights are violated by the admission at trial of an unnecessarily suggestive lineup depends upon the totality of the circumstances surrounding the lineup or confrontation. *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967).

11. The complaint stated in pertinent part:
The affiant, Ofc. R. Sayre UKPD says that on the 22nd day of September, 1990, in Fayette County, Kentucky, the above named _____ unlawfully Committed the Act of Criminal Attempt Rape in the First degree.

In *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), the court described its holding in *Stovall* "as protecting an *evidentiary* interest," *id.* at 113, 97 S.Ct. at 2252, and stated that "a suggestive preindictment identification procedure does not in itself intrude upon a constitutionally protected interest." *Id.* at 113, n. 3, 97 S.Ct. at 2252, n. 3. This led the Seventh Circuit in *Hensley v. Carey,* 818 F.2d 646 (7th Cir.), *cert. denied,* 484 U.S. 965, 108 S.Ct. 456, 98 L.Ed.2d 395 (1987), a § 1983 action for an allegedly improper lineup, to state that:

> the procedural safeguards established in *Brathwaite* and *Stovall* protect only against the admission of unreliable evidence at trial and does [sic] not establish a constitutional right to be free of suggestive lineups.... The rule against admission of evidence from unnecessarily suggestive. lineups is a prophylactic rule designed to protect a core right, that is the right to a fair trial, and it is only the violation of the core right and not the prophylactic rule that should be actionable under § 1983.

*Id.* at 648–49.[12] The court therefore held that "*Stovall* and *Brathwaite* do not establish a right to an impartial lineup as long as the evidence gained through that lineup is not used at trial." *Id.* at 650. Thus, the defendants in *Hensley* could not have violated the plaintiff's constitutional rights since the plaintiff was never tried; and the plaintiff had no cause of action for being wrongly incarcerated for over 100 days. *Id.* See also *Sejnoha v. City of Bisbee,* 815 F.Supp. 1300, 1302–03 (D.Ariz.1993); *Haupt v. Dillard,* 794 F.Supp. 1480 (D.Nev.1992); *Mack v. Butler,* 742 F.Supp. 1007 (N.D.Ill.1990); *Willis v. Bell,* 687 F.Supp. 380 (N.D.Ill.1988). However, the court did leave open the possibility that in extraordinary circumstances, such as coercion or other police misconduct, a cause of action under § 1983 might be stated. *See* *id.* at 650 n. 4.

Although this case is distinguishable from *Hensley* to the extent that Hutsell was tried, and the lineup was presumably used at trial,[13] this difference fails to save his claim. Plaintiff's complaint alleges that the manner in which Hayes conducted the photographic lineup caused plaintiff to be "unreasonably seized without probable cause and deprived of his liberty without due process of law in violation of the 14th Amendment." As in *Hensley,* plaintiff is not challenging a violation of the core right to a fair trial, but merely the purported violation of a prophylactic rule which resulted in the deprivation of his liberty. Nor has he alleged any extraordinary circumstances which would give rise to a constitutional violation. Having failed to state a claim for an alleged violation of a known constitutional right, our inquiry is at an end. *Siegert,* 500 U.S. at ——, 111 S.Ct. at 1793.

Were we to evaluate the lineup, we would hold that the photo lineup was not unduly suggestive. As observed in *Hensley,* "[t]he police are not required to conduct a search for identical twins in age, height, weight or facial features ... [w]hat is required is the attempt to conduct a fair lineup, taking all steps reasonable under the 'totality of the circumstances' to secure such result." *Hensley,* 818 F.2d at 650 (citation omitted). The six photos were of men who bore a resemblance to plaintiff and who had a record for previous sexual offenses. Furthermore, the fact that plaintiff's wallet was found at the scene of the assault made it perfectly reasonable to include his picture in the lineup. The totality of circumstances support the district court's finding that the lineup was not unduly suggestive.

### C.

 Lastly, plaintiff claims that the district court erred in denying his motion for leave to file a second amended complaint in order to add a state law claim for malicious

---

**12.** The *Hensley* court analogized to cases which hold that a *Miranda* violation, without additional evidence of police coercion giving rise to a constitutional violation, does not state a cause of action under § 1983. *Hensley,* 818 F.2d at 649–50. *See also Cooper v. Dupnik,* 963 F.2d 1220 (9th Cir.) (en banc), *cert. denied,* —— U.S. ——, 113 S.Ct. 407, 121 L.Ed.2d 332 (1992); *Warren*

*v. City of Lincoln, Neb.,* 864 F.2d 1436 (8th Cir.), *cert. denied,* 490 U.S. 1091, 109 S.Ct. 2431, 104 L.Ed.2d 988 (1989).

**13.** There is no evidence in the record before us on appeal on this point.

prosecution and a federal claim under 42 U.S.C. § 1983 against officer Hayes for conspiring with officer Sayre to give false testimony to the grand jury in violation of plaintiff's Fourteenth Amendment rights. In light of our conclusion that the officers are entitled to qualified immunity on the Fourth Amendment issue, the proposed amendment would be futile. *See Foman v. Davis*, 371 U.S. 178, 180, 83 S.Ct. 227, 229, 9 L.Ed.2d 222 (1962).

For all the foregoing reasons, the judgment of the district court is **AFFIRMED**.